# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARQUETTE BANK, an Illinois banking association, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )  No. 13 C 2620 |
| DEBRA JO BROWN, MELINDA GABBARD, MEEGAN COLLIER, BRENDA R. LEE, MICHAEL COLLIER, JOHN D. GAY, and RUTHY LARGE, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Before the court is defendants' motion to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, to transfer this action to the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a), or, in the alternative, to dismiss this action for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, we grant the motion to dismiss for lack of personal jurisdiction.

## BACKGROUND

Plaintiff, Marquette Bank ("Marquette"), is an Illinois banking association that in April 2008 made a $3.5 million mortgage loan to Kankakee Motel Associates L.P. ("Kankakee Associates"), an Indiana limited partnership owned and controlled by an Indiana

citizen named Lester Lee.  Neither Kankakee Associates nor Lee is a party to this lawsuit.  The purpose of the loan was to refinance Kankakee Associates' motel property, located in Bourbonnais, Illinois.  Marquette alleges that it made the loan based on Lee's purported personal financial strength as well as his guaranty. When Lee applied for the loan in November 2007, he furnished Marquette with a financial statement indicating that as of January 1, 2007, he had a net worth of more than $19 million.  In October 2008, he furnished Marquette with a financial statement indicating that he continued to have approximately the same net worth.

In mid-2009, Kankakee Associates became delinquent on its loan payments (and by January 2010, the motel was closed).  Lee subsequently furnished Marquette with an October 2009 financial statement representing that he now had a negative net worth.  On August 18, 2010, Marquette obtained a judgment of foreclosure against Kankakee Associates in the amount of $3,999,738.66.  In January 2012, Lee filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Indiana.  It is alleged that as of March 28, 2013, Kankakee Associates and Lee (by virtue of his guaranty) owed plaintiff $2,597,823.58, plus interest, fees, and costs.  Marquette has brought an adversary proceeding against Lee in the bankruptcy case to determine the dischargeability of the debt.

Marquette alleges that Lee misrepresented his financial condition both before and after the issuance of the loan and that after its issuance, Lee "engaged in a series of artifices and fraudulent transfers to entities owned by his" family members and "transferred assets that had been pledged" to Marquette without Marquette's knowledge or permission. (First Am. Compl. ¶ 1.) Marquette claims that in order to induce Marquette to make the loan, Kankakee Associates had executed an "Assignment of Contract" that granted Marquette a security interest in a Land Contract between Kankakee Associates and an entity called Youngevity Mineral Spa, LLC ("Youngevity"), for the sale of Kankakee Associates' real estate and related motel operation. (First Am. Compl. ¶ 80.) According to Marquette, the Land Contract provided that Youngevity's down payment would consist of an option to purchase a "certain tract of real estate" on Grand Cayman Island. (First Am. Compl. ¶ 43.) Marquette alleges that Lee misrepresented the terms of the Land Contract and that Kankakee Associates was never actually granted an option to purchase the Grand Cayman property; rather, the option was granted by an individual named Joel Wallach to one of Lee's other business entities, the Lee Group Holding Company ("Lee Group Holding"), and then transferred to Lee. (First Am. Compl. ¶¶ 44, 46, 48.) It is Marquette's position that Lee "wrongfully usurp[ed]" the option, worth $1.3 million. (First Am. Compl. ¶ 47.)

It is also alleged that in mid-2008, Lee "participated in the entry of a judgment in a collusive action brought by him and corporations owned and/or controlled by him" wherein one of his business entities, Lee Group Holding, sued another of his business entities, Lees Inns of America, Inc. ("Lees Inns"). (First Am. Compl. ¶ 87.) Lee then caused the parties to enter into an agreed judgment pursuant to which all of the assets of Lees Inns were transferred to Lee Group Holding, which was owned by Lee's wife and children. (First Am. Compl. ¶ 93.) Lee then misrepresented to Marquette in October 2008 that he still owned shares in Lees Inns valued at $1.7 million, although he had actually transferred all of his assets to an entity nominally owned by his wife and children. (First Am. Compl. ¶ 95.)

In the instant suit, Marquette alleges that Lee "was aided in his defalcations and deceptions by the defendants[,] . . . who actively conspired with him." (First Am. Compl. ¶ 1.) The defendants are Debra Jo Brown, Melinda Gabbard, and Meegan Collier, Lee's daughters; Brenda R. Lee, Lee's wife; Michael Collier, Lee's son-in-law and an employee and/or officer of one or more of Lee's businesses; John D. Gay, a lawyer who served as counsel to all of Lee's businesses; and Ruthy Large, an employee of Lee's businesses.

Defendants, who are all citizens of Indiana, move to dismiss for lack of personal jurisdiction. Alternatively, defendants ask

us to transfer the case pursuant to 28 U.S.C. § 1404(a) or for dismissal for failure to state claims for civil conspiracy.

## **DISCUSSION**

"The plaintiff has the burden of establishing personal jurisdiction, and where . . . the issue is raised by a motion to dismiss and decided on the basis of written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010). In analyzing personal jurisdiction, we take well-pleaded allegations of the complaint as true unless they are refuted by the defendant in an affidavit. See id. "A federal court exercising diversity jurisdiction has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction." Philos Techs., Inc. v. Philos & D, Inc., 645 F.3d 851, 855 n.2 (7th Cir. 2011). Illinois's long-arm statute authorizes personal jurisdiction to the extent permitted by the Illinois Constitution and the United States Constitution. 735 ILCS 5/2-209(c). "[T]here is no operative difference between these two constitutional limits," so a single constitutional inquiry will suffice. Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010). "The key question is therefore whether the defendants have sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of

fair play and substantial justice.'" <u>Tamburo</u>, 601 F.3d at 700-01 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific. General jurisdiction exists where a defendant has "continuous and systematic general business contacts" with the forum, while specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." <u>RAR, Inc. v. Turner Diesel, Ltd.</u>, 107 F.3d 1272, 1277 (7th Cir. 1997) (quoting <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 416, 414 n.8 (1984)). Plaintiff relies only on specific jurisdiction. "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." <u>Tamburo</u>, 601 F.3d at 702.

Defendants contend that they are not subject to specific jurisdiction in Illinois because they did not purposefully direct their activities at the state or purposefully avail themselves of conducting business here.

## A. __The Lee Family Defendants__

Because the allegations regarding Debra Jo Brown, Melinda Gabbard, Meegan Collier, and Brenda R. Lee are the same,[1] we will treat them as a group and refer to them as the "Lee Family Defendants," as the parties have done. The Lee Family Defendants were members of the board of directors of Lees Inns and members of Lee Group Holding. (First Am. Compl. ¶¶ 3-6.) Lees Inns was the general partner of Kankakee Associates; at all times relevant to the complaint, Lester Lee claimed to be the "100% owner of the equity in Lees Inns." (First Am. Compl. ¶ 13.)

The Lee Family Defendants argue that the only allegation against them that remotely involves Illinois is that in their capacity as board members of Lees Inns, they executed a written consent authorizing it, as the general partner of Kankakee Associates, to enter into the loan with Marquette, and caused the consent to be sent to Marquette. In defendants' view, this act cannot be construed as being "purposefully directed" at Illinois, since there are no allegations that the Lee Family Defendants did anything more than consent to the loan, something a board member would have done even in the absence of fraud. Defendants also maintain that this alleged action in furtherance of the conspiracy

---

[1] Regarding Brenda R. Lee, it is also alleged that she accompanied Lester Lee to an October 2009 meeting with plaintiff's representatives at its headquarters in Illinois, First Am. Compl. ¶ 125, but plaintiff does not rely on that conduct as a basis for an assertion of personal jurisdiction over Brenda. (In any event, that conduct is not alleged to have been tortious.)

is too attenuated to support the imposition of personal jurisdiction.

In response, Marquette cites the "express aiming test," pursuant to which constitutionally-sufficient "contacts can be imputed to a defendant if the defendant is accused of committing an intentional tort by actions that are 'expressly aimed' at the forum state." See Mobile Anesthesiologists, 623 F.3d at 444 (quoting Calder v. Jones, 465 U.S. 783, 789 (1984)).[2] Plaintiff asserts that in addition to authorizing Marquette to enter into the loan transaction, the Lee Family Defendants also "actively participated in the wrongful conversion of a $1.3 million [] asset, the Option to purchase the Cayman Islands property, by The Lee Group Holding Company" and were the "willing beneficiaries" of the allegedly collusive lawsuit brought by Lee, and that these "sham transfers" were attempts "to deprive creditors, of which Marquette was one, of the assets of Lester Lee who was on the hook through his Guaranty." (Pl.'s Resp. at 18-21.)

The Lee Family Defendants' only alleged conduct with respect to the option is their consent as members of Lee Group Holding to the assignment of the option from that entity to Lester Lee; this

_____

[2] Plaintiff refers to the doctrine as the "effects test," but we will use the term "express aiming test," which the Seventh Circuit expressly prefers as "more faithful" to Calder, in which the Supreme Court announced the test. See Mobile Anesthesiologists, 623 F.3d at 445 n.1.
    Plaintiff does not rely on the "conspiracy theory" of jurisdiction (under which it would argue that we may assert jurisdiction over non-resident defendants who had no contacts with Illinois if they participated in a conspiracy with defendants who did have such contacts).

action occurred *after* the alleged conversion of the asset by Lee Group Holding. (First Am. Compl. ¶ 49.) We are unpersuaded by the argument that the consent to this assignment had a "direct impact" on Marquette, and even if it did, there is no evidence from which we can infer that the Lee Family Defendants "expressly aimed" this action at Illinois or knew that the effect of the consent would be felt by Marquette. Moreover, merely benefitting from an allegedly collusive lawsuit orchestrated by someone else does not even rise to the level of "conduct" that can be "aimed." The remaining alleged conduct of the Lee Family Defendants is their authorization of Marquette to enter into the loan transaction, which is not a tortious act. Plaintiff has failed to show that Debra Jo Brown, Melinda Gabbard, Meegan Collier, and Brenda R. Lee are subject to personal jurisdiction in Illinois; therefore, they will be dismissed from this action.

**B.    Michael Collier**

Michael Collier was the president of Hotel Capital Partners, LLC ("Hotel Partners"), one of Lee's business entities, and ran Lees Inns "on a day-to-day basis." (First Am. Compl. ¶ 7.) He is alleged to have accompanied Lester Lee to the Cayman Islands to have the Grand Cayman property appraised and to negotiate the Land Contract, First Am. Compl. ¶ 72, and then to have given "Ruthy Large the Land Contract knowing that it contained material misrepresentations and omissions," First Am. Compl. ¶ 45.

Defendant contends that this conduct was not expressly aimed at Illinois.  In response, Marquette submits the unsworn declaration of Joel Wallach, the individual who (or whose company, Youngevity) entered into the Land Contract to buy the Kankakee motel property, as well as the unsworn declaration of Mikal Christopherson, a Marquette loan officer who was involved in the Kankakee Associates loan.  Marquette relies on the declarations to attempt to show additional conduct by Collier--that he "tricked Joel Wallach into granting the Option [to purchase the Cayman Islands property] to [Lee Group Holding]"; "falsely reported to the independent appraiser [hired to appraise the Kankakee motel property] that the purchase price included the Cayman Islands property"; "continued to [mis]represent to Marquette that the Option had not been exercised"; spoke on the phone with Christopherson 10-15 times, exchanged 20 e-mails with him, and came to Illinois twice in relation to the loan; and "spoke to an appraiser in Illinois, and affirmatively misled him, as he did [Marquette's] representative." (Pl.'s Resp. at 21-22.)

Although the declarations of Wallach and Christopherson state that they are made "pursuant to 28 U.S.C. § 1746," they are missing a critical element in that they fail to state that they are made under penalty of perjury.[3]  Therefore, we will not consider them.

---

[3] Defendants discuss this deficiency in their reply brief.  We granted Marquette's motion for leave to file a surreply; it failed to address this deficiency or file properly-amended declarations.

As to Collier, we are left with the allegation that he gave the Land Contract to Ruthy Large knowing that it contained misrepresentations and omissions. The complaint also contains the conclusion that Collier "caused" the fraudulent Land Contract for the Kankakee motel property to have been delivered to Marquette, First Am. Compl. ¶ 47, but this statement is not supported by the mere fact that Collier gave the contract to Large. It is not alleged that he directed Large to send the contract to Marquette or even that he gave it to her for the purpose of having it sent to Marquette. We cannot infer that this conduct was expressly aimed at Marquette in Illinois. Accordingly, Michael Collier will be dismissed from this action for lack of personal jurisdiction.

**C.    John Gay**

John Gay is an Indiana lawyer who performed legal work for Lee's companies. (First Am. Compl. ¶ 8.) He is alleged to have sent an opinion letter to Marquette regarding the loan that "could not have been communicated . . . in good faith," given "the knowledge he had at the time of its creation." (First Am. Compl. ¶ 38.) The letter stated that as counsel for Kankakee Associates, Gay had reviewed the loan documents, the note, and the corporate proceedings pursuant to which the loan was approved and authorized. It also stated that, among other things, in Gay's opinion, "the execution and delivery of the [Mortgage Security Agreement Assignment of Leases and Rents and Fixture Filing dated April 11,

2008] and the Loan Documents, the performance thereunder by [Kankakee Associates] will comply with all applicable law and will not violate or conflict with the instruments under w[hich] [Kankakee Associates] is reorganized or any applicable contracts or agreements." (First Am. Compl. Ex. 6, at 2.) Marquette contends that Gay's opinion was false because he was aware that Lee had "converted" the option, that Lee's representations about his finances and warranties in his guaranty were false, and that there was litigation pending that could adversely affect Lee's performance as a guarantor, and Gay did not disclose any of these circumstances to Marquette. (Pl.'s Resp. at 23-24.) Defendants contend that the opinion letter is a "routine business communication" that is insufficient to establish a basis for personal jurisdiction. (Def.'s Mem. in Supp. of Mot. at 14.)

Marquette has alleged that Gay purposefully directed tortious activity at Illinois (where he clearly knew Marquette was located) by allegedly sending Marquette his opinion letter, which contained misrepresentations and omissions, in furtherance of a conspiracy with Lee to defraud Marquette. This contact with Illinois is sufficient to establish personal jurisdiction over Gay under the "express aiming" test. The decisions cited by defendants, Juristech Associates, Ltd. v. Krieg Devault Alexander & Capeheart, LLP, No. 02 C 620, 2002 WL 1343746 (N.D. Ill. June 18, 2002) (Grady, J.), and Cobra Capital, LLC v. RF Nitro Communications,

Inc., No. 02 C 493, 2002 WL 1263985 (N.D. Ill. June 5, 2002), are distinguishable because neither applied the "express aiming" test and the business communications at issue were not alleged to have been intentional and allegedly tortious conduct. Furthermore, we are unpersuaded by defendants' assertion that the opinion letter contained only "basic and rudimentary opinions" that were true and therefore did not constitute a tortious act in furtherance of a conspiracy, Defs.' Reply at 11-12. Marquette has sufficiently alleged why the letter was false and misleading.

Defendants assert that even if Gay's contact with Illinois is sufficient, we should refuse to exercise personal jurisdiction pursuant to the Illinois fiduciary-shield doctrine. The doctrine gives us discretion to decline to exercise personal jurisdiction over an individual whose presence and activity in the forum state were solely on behalf of his employer or other principal. See Rice v. Nova Biomedical Corp., 38 F.3d 909, 912-14 (7th Cir. 1994) (citing Rollins v. Ellwood, 565 N.E.2d 1302, 1313-18 (Ill. 1990)). The doctrine can be applied even to defendants who are alleged to have committed a tortious act within the scope of their employment. Rollins, 565 N.E.2d at 1318. Fairness is the key inquiry; significant factors to consider in determining whether it would be reasonable to hale an agent into court based on his actions include whether the agent was acting also or instead to serve his own personal interests and whether his conduct was of his own choosing.

See, e.g., Brujis v. Shaw, 876 F. Supp. 975, 978-80 (N.D. Ill. 1995) (citing cases applying Illinois law).

Marquette's allegations describe actions Gay took on behalf of Lester Lee and/or Lee's thirty-plus business entities. (First Am. Compl. ¶ 8.) Marquette argues in a conclusory fashion that Gay is not entitled to fiduciary-shield protection because "his legal representation was only of [Kankakee Associates]," "in relation to Lester Lee he was an autonomous actor," and he "had the total discretion as to the content of his opinion letter," but it has not produced any such evidence. (Pl.'s Resp. at 27-28.) Moreover, the allegations of the complaint belie the argument. Gay "served as counsel to all companies and business entities operated, owned and/or controlled by Lester Lee." His "office was located at the same address as [Kankakee Associates] and [Lees Inns]." (First Am. Compl. ¶ 8.) It is also alleged that "[a]t all times, [Gay] was directed by Lester Lee." (First Am. Compl. ¶ 55.) Gay was carrying out Lee's wishes when he sent the opinion letter to Marquette; there is no evidence to the contrary.

Marquette maintains that we should not apply the fiduciary shield because Gay personally benefitted from his contact with Illinois, but it presents no such evidence. It argues simply that Gay's income was dependent upon Lee and that he therefore acted in his own economic self-interest by sending the opinion letter. The Illinois Supreme Court, however, has stated that there is no

exception to the fiduciary shield doctrine simply because an employee is serving his own financial interests by performing the tasks assigned him by his employer. <u>Rollins</u>, 565 N.E.2d at 1318.

We find that the fiduciary shield doctrine is applicable to John D. Gay and accordingly decline to exercise personal jurisdiction over him.

**D.  <u>Ruthy Large</u>**

Like John Gay, Ruthy Large worked for several companies controlled by Lester Lee, including Hotel Partners.  When she worked for Hotel Partners, her title was "Loan Manager," and her responsibilities included complying with financial reporting requirements for loans and fielding questions from loan officers. "She served as the loan processor, closing coordinator, and she serviced the loans."  (First Am. Compl. ¶ 9.)

It is alleged that Large had a number of contacts with Illinois that constituted tortious conduct.  Marquette alleges that Large gave the Land Contract to Robert Schneider, another Hotel Partners employee, to send to Mikal Christopherson at Marquette with the intention to have Marquette rely upon the contract, even though Large knew it contained a material misrepresentation about Youngevity's right to grant the option.  (First Am. Compl. ¶ 45.) In December 2007, she told Christopherson that she was his "point of contact" about the loan application, and after the loan was made, she allegedly sent two of Lee's false financial statements to

Marquette knowing that they contained misrepresentations.  (First Am. Compl. ¶¶ 81, 85, 120-21.)  Furthermore, after Lee allegedly fraudulently transferred his assets and Christopherson asked Large about the loss of assets, Large told him that "Mr. Lee has been doing estate planning for the last several years and the transfer of those items are merely a part of that." (First Am. Compl. ¶ 122 & Ex. 30.)  Marquette alleges that this was a misrepresentation because Large knew that the transfers were part of his attempts to put his assets beyond the reach of creditors.  Large's allegedly tortious conduct is alleged to have been in furtherance of a conspiracy with Lee to defraud Marquette.  Her contacts with Illinois are sufficient to establish personal jurisdiction under the "express aiming" test.

Defendants raise the fiduciary shield doctrine with respect to Large.  The allegations of the complaint indicate that her actions were taken as an employee of Lester Lee.  Her alleged misrepresentation about estate planning is even explicitly alleged to have been made "[a]t the direction of Lester Lee." (First Am. Compl. ¶ 122.)  Marquette responds with a weak argument unsupported by any evidence---that Large "was the Loan Manager who decided what documents Marquette would receive" and that her actions were "not done in the interest of her employer." (Pl.'s Resp. at 30.)  The decisions cited by Marquette in support of its argument are inapposite because they involved senior corporate officers.

We find that the fiduciary shield doctrine is applicable to Ruthy Large and accordingly decline to exercise personal jurisdiction over her.

Because we conclude that we lack personal jurisdiction over the defendants, we need not reach their motion for transfer of this case or for dismissal for failure to state a claim.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss [42] is granted. This action is dismissed for lack of personal jurisdiction without prejudice to refiling in the Southern District of Indiana.

DATE:        March 31, 2014


ENTER:       _____

             John F. Grady, United States District Judge